**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 11-633** |
| **PHILLIP ERIC WEEMS,** | : | |
| a/k/a "Black" | | |
| a/k/a "Dennis Mitchell," | : | |
| a/k/a "Douglas Mitchell," | | |
| a/k/a "Anthony Wilson," | : | |
| a/k/a "Robert Wilson," | | |
| a/k/a "Michael Woods," | : | |
| a/k/a "Eric Devero" | | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The defendant was the leader and organizer of an elaborate check-cashing scheme in which he and more than 70 others that he recruited to work for him made and uttered approximately 597 forged and counterfeit securities with an approximate total value of $1,224,946.72.   The workers for the defendant presented approximately 331 forged and counterfeit securities with an approximate total value of $658,270.80 to organizations operating in and affecting interstate commerce, including check cashing businesses and financial institutions, as well as pure bred English Bulldog breeders, between January and November, 2009.   That same year, the defendant straw purchased three firearms.

Prior to committing these crimes, the defendant was convicted in 1996 of two counts of simple assault for an assault on a mother and child, and in 1997 for two separate charges of robbery and possessing instruments of crime in which he robbed a couple at gunpoint.   For the robbery convictions, the defendant was sentenced to six to 12 years in prison, and served the maximum term of that sentence because the parole board twice denied his parole due to his

institutional behavior and misconduct.   As a result of his robbery convictions, the defendant was prohibited by law from possessing a firearm or ammunition.

While in prison, the defendant authored a 56-page manuscript for a "How-To" book titled "CRIME PAYS, Volume 1: Instructional Manual on How to Successfully Implement One of the Most Advanced Adult Hotline Operations."   In addition to the sections quoted by the Probation Office in the defendant's Presentence Investigation Report, page 11, note 4, in which the defendant boasts that he "holds the highest degree in criminology through utilizing prison time to his advantage . . . [by building] . . . a multi-million dollar empire that investigators and law enforcement have been unable to infiltrate," the defendant writes:

> "White-Collar Crime is one of the most sophisticated rackets of illegal activity today.   Unlimited amounts of money can be made virtually overnight and the parties involved usually face minimal and/or NO CONSEQUENCES at al. This is because federal, state and local authorities are so occupied in their fight against black-collar crime and the alleged WAR ON DRUGS, that none of them have the time and/or manpower to effectively undermine white-collar crime, which over the years has become extremely advanced."

The defendant includes at the end of Volume 1, a special preview of "Volume 2: Instructional Manual on How to Successfully Implement One of the Most Advanced Business Checking Operations."   In that preview, the defendant lays out an eight-step process "to obtain fake photo id cards for five stolen identities."

On January 30, 2013, the defendant pled guilty pursuant to a plea agreement with the government to an Information charging his fraud and straw purchasing conduct.   In the plea agreement, the defendant and his counsel entered into certain stipulations with the government related to the nature of his criminal conduct, including but not limited to stipulation regarding the amount of his attempted loss and a stipulation as to the number of victims of his offense.   The defendant also met with U.S. Probation Officer George H. McGary, and provided information to

the officer about his financial condition as part of the officer's preparation of the defendant's Presentence Investigation Report (PSR).   In that interview, the defendant informed Officer McGary that he only had one significant asset – he co-owns a property located at 2700 Lardner Street in Philadelphia.   The defendant did not disclose that he had any sources of income.

After the initial draft of the defendant's PSR, the defendant sent to Officer McGary and the government several pro se objections to the PSR.   Included among the objections are an objection to the stipulated loss and an objection to the stipulated number of victims.   As to the former, he objects not to the actual dollar-value of his attempted and successful check fraud activity, but instead he contends that the government failed to establish that some of the checks he uttered were counterfeit; in the latter claim, he contends that the number of his actual victims is lower than the stipulated number of 50 or more because "although the individual check cashing businesses take an initial temporary loss, the Corporation Check Verification Service Provider or Insurance Company of each of the check cashing businesses ultimately bears the loss."

Furthermore, as part of the continued investigation into the extensive criminal conduct by the defendant and his co-conspirators, FBI Special Agent Kurt Kuechler reviewed certain prison phone calls, emails, and other records related to the defendant's conduct in prison. In those items, the defendant speaks and writes about receiving rental income for the Lardner Street property that he uses to "maintain" himself in prison, and his commissary records reflect the receipt of such income.   He also states that he owns three or four other properties in addition to the Lardner Street property, one of which he describes as nicely, fully-furnished, and the other of which he describes as "more expensive."

For these reasons, as well as for the reasons provided below, it is clear that the defendant was undeterred by his long prior period of incarceration and upon release, simply

decided to switch criminal tactics from violent crime to fraud on the mistaken belief that he would face less time of imprisonment.   He is also in breach of his plea agreement.   Below, the government requests that the Court order specific performance of the defendant's obligations under his plea agreement.

By the terms of the plea agreement, the government agreed that the defendant should receive a total of a three-level downward departure to the offense level for acceptance of responsibility and to recommend a sentence of imprisonment at the bottom of the final Sentencing Guideline range determined by the Court.   Accordingly, the government adheres to this recommendation.

## I.    BACKGROUND

On January 30, 2013, the defendant appeared before this Court and pled guilty pursuant to a plea agreement with the government to an Information charging him with one count of conspiracy to utter counterfeit and forged securities, in violation of Title 18, United States Code, Section 371 (Count One); one count of uttering a forged security and aiding and abetting, in violation of Title 18, United States Code, Sections 513(a) and 2 (Count Two); one count of uttering a counterfeit security and aiding and abetting, in violation of Title 18, United States Code, Sections 513(a) and 2 (Count Three); and three counts of aiding and abetting the making of false statements to federal firearms licensees, in violation of Title 18, United States Code, Sections 924(a)(1)(A) and 2 (Counts Four through Six).   A sentencing hearing is scheduled for Friday, January 31, 2014, at 2:00 p.m.

## II.       THE OFFENSES

If this case had proceeded to trial, the evidence (more explicitly presented in the government's change of plea memorandum and on the record at the defendant's change of plea

hearing) would have shown that in less than a year's time, the defendant masterminded and led an extensive and elaborate check cashing scheme that involved more than 70 people working for him, the making and uttering of approximately 597 forged and counterfeit securities with an approximate total value of $1,224,946.72, and the defrauding and attempts to defraud more than 50 victims, including banks, check cashing companies and pure-bred English Bull Dog breeders. The defendant and his co-conspirators actually presented approximately 331 forged and counterfeit securities, and obtained approximately $183,615.95 in proceeds of their illegal activities. In addition, despite his two prior felony convictions for robbery which rendered him prohibited from possessing firearms or ammunition, the defendant used straw purchasers to illegally obtain three firearms.

## III.      SENTENCING CALCULATION

### A.      Statutory Maximum Sentence.

The Court may impose a statutory maximum sentence of forty years imprisonment. Full restitution of as much as $183,615.95 also shall be ordered. Forfeiture of any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses and the firearms involved in the commission of such offenses also may be ordered.

### B.      Sentencing Guidelines Calculation.

The Probation Office has determined the advisory guideline range to be 121 to 151 months imprisonment, calculated as follows. For offenses involving violations of 18 U.S.C. § 513(a), under U.S.S.G. § 2B1.1, the base offense level is **6**. Because the intended loss was more than $1,000,000 but less than $2,500,000 (approximately $1,200,000), 16 levels are added pursuant to U.S.S.G. § 2B1.1(b)(1)(I), resulting on an offense level of **22.**

The base offense level is increased by a four-level upward adjustment because the offense involved 50 or more victims (at least 50 victims suffered a financial loss in this case), pursuant to U.S.S.G. § 2B1.1(b)(2)(B), resulting in an offense level of **26.**

The base offense level is increased by a two-level upward adjustment because the offense involved the possession or use of device-making equipment, pursuant to U.S.S.G. § 2B1.1(b)(11)(A), resulting in an offense level of **28.**

The base offense level is increased by a four-level upward adjustment because the defendant organized and led criminal activity involving five or more participants (more than 70 total and more than 50 check runners), pursuant to U.S.S.G. § 3B1.1(a), resulting in an offense level of **32.**

The base offense level is increased by a one-level upward adjustment because of the operation of the multiple-count adjustment, U.S.S.G. § 3D1.4 for the defendant's firearms offenses, <u>see</u> PSR ¶¶ 57-67, resulting in an offense level of **33.**

The Probation Office applied a total of a three-level downward adjustment to the defendant's offense level pursuant to U.S.S.G. § 3E1.1(a) and (b) for acceptance of responsibility (although the Probation Office notes in response to the defendant's first objection that "[i]f the defendant maintains the position that [the number of victims and loss related enhancements] no longer apply, the Court may consider if the defendant has genuinely accepted responsibility for his criminal conduct and is eligible for the three level reduction under U.S.S.G. § 3E1.1(a) and(b)."), resulting in an offense level of **30.**

The defendant is in Criminal History IV, established by four criminal history points.  PSR ¶ 90.

The resulting advisory guideline range for an offense level of 30 and a criminal history level IV is 121-151 months imprisonment.

## C.       Government's Objection to the Presentence Investigation Report.

The government objects to the non-application of the sophisticated means enhancement, U.S.S.G. § 2B1.1(b)(10)(C).   Application Note 9 to this enhancement provides in relevant part that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.   For example, . . . [c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."   In determining whether to apply the enhancement to fraud cases, courts have asked whether the defendant's fraud scheme, "when viewed as a whole, was notably more intricate than that of a garden variety [here mail] fraud scheme."   United States v. Cole, 296 Fed. Appx. 195, 197 (2nd Cir. 2008) (quoting United States v. Hance, 501 F.3d 900, 909-910 (8th Cir. 2007)).   "The scheme may be sophisticated even if the individual elements taken alone are not."   United States v. Evano, 553 F.3d 109, 113 (1st Cir. 2008) (quoting United States v. Jackson, 346 F.3d 22 (2nd Cir. 2003)).

Here, the defendant directed and assisted many of his check runners in obtaining driver's licenses and official photo identification cards in addresses that were incorrect to make it more difficult for victims of the scheme to find them; registered fake corporations with the Commonwealth of Pennsylvania often using names of real franchise corporations to make them appear to be real; opened business checking accounts in the names of the fake corporations and put enough money into the account to fool the diligent check casher who actually called a bank to verify that the account had money to support a presented check; cashed checks often at multiple check cashing companies on the same day and then tried, often successfully, to pull out the original

money in the checking account before the checks were processed; and took the majority of the more than $180,000 in proceeds, giving his workers only a small percentage of the value of each check cashed.   He also made and uttered hundreds of additional checks that might have been cashed but for law enforcement intervention, and made and successfully cashed checks belonging to real companies by using check-producing software and a laser printer.   In fact, to further legitimize some of the checks, he made fake pay stubs.   And he recruited more than 70 people to assist him in perpetrating his scheme.

The application of the "sophisticated means" enhancement in these circumstances is warranted.   In other cases, courts, including the Third Circuit, have found application of the enhancement to be appropriate in check-cashing schemes.   United States v. Norman, 465 Fed.Appx. 110 (3d Cir. 2012) (unpublished decision) (rejecting argument that sophisticated enhancement was not deserved because "the persons involved in the conspiracy ... did nothing more complicated than pretend to be people they were not," and finding that the defendant and his conspirators trained a network of check-runners and created numerous false identifications and counterfeit checks in a sufficiently convincing manner to evade detection from four major financial institutions despite hundreds of transactions in which the appellants collected over $780,000, noting "[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.") (citing United States v. Finck, 407 F.3d 908, 915 (8th Cir. 2005), United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003), and United States v. Rettenberger, 344 F.3d 702, 709 (7th Cir.2003).   See also, e.g., United States v. Jones, 533 Fed.Appx. 448, 459 (5th Cir. 2013) (affirming application of the sophisticated enhancement where the defendant's "activity involved more than merely attempting to negotiate a fraudulent check," but rather involved participation "in a scheme that required the conspirators to create false

identification documents in order to cash fraudulent checks.   To execute this fraud successfully, [the defendant] provided her photograph to other conspirators so that it could be used to create the necessary fraudulent identification card, and she attempted to negotiate a forged check while posing as the individual identified on that card," and concluding that "although certain aspects of Jones's offense may not have been especially complex or intricate, some of the means used by her during her participation in the scheme were sophisticated."); United States v. Calderon, 209 Fed.Appx. 418, 419 (5th Cir. 2006) (unpublished decision) (rejecting the argument that "printing checks using a computer program available for purchase by anyone at a local office supply store, sending a check in the mail to purchase coins, and walking a check into a financial institution to open an account did not constitute sophisticated means," and concluding "[e]ven though certain aspects of [defendant's] scheme were not sophisticated, the offense as a whole involved sophisticated means").

### D.    Defendant's Objections to the Presentence Investigation Report.

The defendant, pro se, has raised several objections to the sentencing guideline range calculated by the Probation Officer in the Presentence Investigation Report.   Although the defendant is represented by counsel, each of these objections will be addressed in turn in the event that defense counsel chooses to adopt these objections at the sentencing hearing.

The Federal Rules of Evidence are inapplicable in sentencing proceedings, see Fed. R. Evid.1101(d)(3), and the Court may consider relevant information without regard to its admissibility at trial.   U.S.S.G.§ 6A1.3.   The only limitation is that evidence presented in a sentencing hearing must have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G.§ 6A1.3 (2007); United States v. Watts, 519 U. S.148, 157 (1997); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and

conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing sentence."); United States v. Tucker, 404 U.S. 443, 446 (1972) ("a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.").

Hearsay testimony from government agents is commonly admitted at sentencing, so long as it has sufficient indicia of reliability, such that a sentencing judge may consider it in making the factual determinations required by the Guidelines.   See United States v. Ferguson, 102 Fed. Appx. 257, 258 (3d Cir. 2004) (not precedential); see also United States v. McGlory, 968 F.2d 309, 347 (3d Cir. 1992).   Such evidence, offered at sentencing, does not implicate the Sixth Amendment Confrontation Clause.   See United States v. Wynn, 214 Fed. Appx. 118 (3d Cir. 2007) (unpublished decision) (citing United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005) (refusing to apply Crawford to sentencing hearing); United States v. Luciano, 414 F.3d 174, 179 (1st Cir. 2005) (pointing out that Crawford concerned hearsay at trial and that it would not alter its conclusion that "there is no Sixth Amendment Confrontation Clause right at sentencing" ); United States v. Roche, 415 F.3d 614, 618 (7th Cir. 2005) (explaining that the "relevant provision at sentencing is the due process clause, not the confrontation clause," because witnesses at sentencing are not accusers); United States v. Martinez, 413 F.3d 239, 243 (2d Cir. 2005) (rejecting defendant's invitation to reconsider the applicability of the Confrontation Clause in light of Crawford ); United States v. Stone, 432 F.3d 651, 654 (6th Cir. 2005) ( "[B]ecause Crawford was concerned only with testimonial evidence at trial, Crawford does not change our long-settled rule that the Confrontation Clause does not apply in sentencing proceedings." ); United States v. Brown, 430 F.3d 942, 943-44 (8th Cir. 2005) (noting that Crawford "does not alter the

pre- <u>Crawford</u> law that the admission of hearsay testimony at sentencing does not violate confrontation rights").

### 1. The Probation Office Correctly Applied a 16-level Upward Adjustment Pursuant to § 2B1.1(b)(1)(I) and to the Stipulation of the Parties to the Defendant's Sentencing Guidelines Range.

Here, the defendant's guidelines are subject to a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) because the defendant intended a loss of approximately $1,224,946.72 from the victims of his scheme.   As the Probation Officer notes, the defendant stipulated to this conduct in his plea agreement.   Moreover, the government will present evidence at sentencing, in the form of the testimony from FBI Special Agent Kurt Kuechler, that the defendant uttered and organized the presentment of approximately 331 forged and counterfeit securities with an approximate total value of $658,270.80, and uttered but had not yet presented because of law enforcement intervention, another approximately $566,675.92 in additional securities.   This evidence is enough to establish, by a preponderance of the evidence, that the defendant's intended loss was over $1,000,000 and that his offense level was properly enhanced by 16 levels in the sentencing guideline range calculation.

Ignoring the parties' stipulation to the contrary, see Guilty Plea Agreement ¶ 6(a), the defendant, <u>pro se</u>, objects to the Probation Office's application of a 16-level upward adjustment pursuant to U.S.S.G. § 2B1.1(b)(1)(I) to the defendant's Sentencing Guideline range on two grounds.   First, the defendant incorrectly asserts that "because the securities [falsely uttered by the defendant and his co-conspirators] were *facially genuine* checks that were issued by financial institutions such as Citizens Bank, Wachovia Bank, etc. . . . the United States failed to satisfy the counterfeit jurisdictional element" of Title 18, United States Code, Section 513.   He further notes that to obtain the facially genuine checks, his "co-conspirators opened legitimate

business checking accounts under . . . shell companies such as Anosier Communications, LLC d.b.a. metroPCS, Demetrius Restaurants, LLC d.b.a Taco Bell, etc.," and that "his co-conspirators registered under their names by filing legitimate Certificates of Organization, Forms SS-4, etc." The defendant's claim of error is not only incorrect as a matter of law, but as the Probation Office notes in response, may require the Court "to consider if the defendant has genuinely accepted responsibility for his criminal conduct."   PSR, at page 32.   It should be noted that the defendant does not specifically challenge the dollar amount of the intended loss attributed to the defendant by the Probation Office and by stipulation of the parties, that is, more than $1,000,000 but not more than $2,500,000.

As a preliminary matter, it should be noted that the defendant's so-called "jurisdictional" claims are not in fact jurisdictional, but are simply claims predicated on the defendant's contention that the evidence fails to establish that certain of his false checks were "counterfeit" within the meaning of the statute.   The defendant is bound by his stipulation to his conduct, and the Court need not revisit its finding at the plea hearing that there was a factual basis for the guilty plea.   Moreover, the Court's finding of a factual basis was correct as a matter of law.

In United States v. Moskal, 498 U.S. 103, 107-109 (1990), the Supreme Court, in interpreting Title 18, United States Code, Section 2314 (interstate transport of falsely made counterfeited secutities), found that "falsely made" encompasses facially genuine documents that are made to contain false information.   In Moskal, the defendant asserted that when a vehicle title is issued by appropriate state authorities that do not know of its falsity, the title is "genuine" or valid as the state document it purports to be and therefore not "falsely made."   Id. at 107.   In that case, the government had charged Moskal for knowingly procuring cars in Pennsylvania, rolling back the odometers, and then obtaining from Virginia state authorities genuine vehicle titles that

incorporated the fraudulent odometer readings.   The Supreme Court found that the words "falsely

made" "are broad enough, on their face, to encompass "washed" titles containing fraudulently

tendered odometer readings: "Such titles are 'falsely made' in the sense that they are made to

contain false, or incorrect, information."   Id.   The Court found its interpretation to be "consistent

with ordinary usage to speak of a security as *being* 'falsely made' regardless of whether the party

responsible for the physical production of the document (here the Commonwealth of Virginia)

*knew* that he was making a security in a manner that incorporates false information."   Id.

(emphasis in original).

          The Moskal decision affirmed one of the findings of the Third Circuit in United

States v. Davis, Smith and Moskal, 888 F.2d 283 (3d Cir. 1989).   The Supreme Court had not

been asked to address, and specifically declined to issue *dicta* on, another issue that had been

presented to the Third Circuit: whether the defendants' convictions also should be vacated because

the state title certificate was not "counterfeited" as defined in Title 18, United States Code, Section

513.   Id. at 285.   On that issue, the Third Circuit found that "[h]aving decided, as a matter of law,

that the 'washed' certificates were 'falsely made' under § 2314, there is ample evidence in the

record to support the conclusion that appellants caused the Virginia title certificates to be 'falsely

made' in their entirety under § 513."   Id. at 285; see also United States v. Blakey, 960 F.2d 996

(11th Cir. 1992) (finding Moskal's determination that "falsely made" covers genuine documents

that contain false or incorrect information to be relevant in the Section 513 context, and finding the

document in question to have been properly charged as "counterfeit" rather than "forged" because

although it was an altered originally valid check, all of the essential information was falsified).

Cf. United States v. Kouevi, 698 F.3d 126 (3d Cir. 2012) (extending the definition of "falsely

made" in <u>Moskal</u> to 18 U.S.C. § 1546(a) (visa fraud) and finding that "falsely made" in that statute also encompasses genuine documents containing false information).

Here, as the defendant acknowledges, as part of causing the counterfeit checks to be *falsely made*, he and his co-conspirators went through an elaborate and sophisticated process of registering shell corporations with the Commonwealth of Pennsylvania under business names to create the specter of legitimate businesses: metroPCS, Taco Bell, etc.   Using these registered names, and in many cases, the Certificates of Organization issued as a result of their incorporation paperwork, the defendant and his co-conspirators opened business checking accounts with unsuspecting banks, who offered as part of their services check books containing checks in the name of the corporations (in some cases, the defendant even caused the logo of the legitimate business to be placed on the checks provided by the bank).   To ensure that their deception worked, the defendant and his co-conspirators deposited enough money into these business checking accounts to satisfy any industrious check cashing employee who called the bank to verify that funds were in the checking account before processing any check drawn on the account (of course, not suspecting that the defendant and others would try to withdraw the funds before their check was presented by them to the bank for redemption).   After receiving the checks produced through a service provided by the bank, the defendant and his co-conspirators also marked the checks with notations designed to make the checks appear to be payroll checks, usually by noting in the memo section the words "Pay Period" followed by the interval of the week prior to the day the check was being presented.   Under these circumstances, it is clear that the defendant caused the false making of the checks at issue under § 513, and the Court correctly found a factual basis for the Section 513 conduct.

Second, the defendant also incorrectly asserts that because the shell companies did not operate and therefore "were not affecting interstate commerce," the United States again "failed to satisfy the required interstate jurisdictional element" of the term "organization" under Title 18, United States Code, Section 513.   These assertions, which the Probation Office cautions also run potentially afoul of any credit for acceptance of responsibility, are also incorrect as a matter of law. As before, the defendant mischaracterizes his argument as going to the "jurisdiction" of the Court when it really speaks only to whether there was a factual basis for the "counterfeit" element of the Section 513 charge (something again, the defendant stipulated to in his plea agreement). Moreover, Third Circuit case law soundly supports the factual basis:   In United States v. Hanson, 132 Fed. Appx. 981(3d Cir. 2005), the Third Circuit addressed the question whether the "of an organization" requirement of 18 U.S.C. § 513 may be fulfilled by the use of securities drawn on fictitious individual account holders of a legitimate bank.   Id. at 982.   The Court found that the bank on which the checks were drawn was "an 'organization' that is clearly involved in interstate commerce," and the use of a legitimate bank name on the checks "added an air of legitimacy to the scheme as store employees were more likely to accept checks that carried the bank name and routing number."   Id. at 982-83.   Accordingly, the Court found that the checks could "belong to both the individual account holder and the banking entity ("organization") purportedly issuing the check for the purposes of Section 513."   Id. at 983; see also, e.g., United States v. Lee, 439 F.3d 381 (7th Cir. 2006) (acknowledging case law finding that fictitious entities are not organizations under 18 U.S.C. § 513, but agreeing with other Courts of Appeals that Section 513 does not expressly or impliedly state that a document may be the security of only one organization and finding it rational that a jury could conclude that checks are securities of both the issuing banks and account holders).

The defendant cannot get around the clear holding of Hanson that the issuing banks for his checks, which he acknowledges include obvious interstate actors such as Citizens Bank and Wachovia Bank, satisfy the "organization" requirement of § 513.   Again, the Court properly found a factual basis for the defendant's guilty plea, and the defendant should be held to his stipulation.

> **2.      The Four-Level Upward Adjustment to the Defendant's Base Offense Level because the Offense involved More Than 50 Victims Should Be Applied.**

Under U.S.S.G. § 2B1.1(b)(2)(B), the base offense level is increased by a four-level upward adjustment when the offense involved 50 or more victims.   The defendant, pro se, objects to this enhancement on the grounds that, despite his stipulation to the contrary, "although the individual check cashing businesses take an initial temporary loss, the Corporation Check Verification Service Provider or Insurance Company of each of the check cashing businesses ultimately bears the loss."   The Probation Office notes in response that it received evidence supporting this enhancement, and that if the defendant, who stipulated to the enhancement, "maintains the position that th[is] enhancement[] no longer appl[ies], the Court may consider if the defendant has genuinely accepted responsibility for his criminal conduct and is eligible for the three-level reduction under U.S.S.G. §§ 3E1.1(a) and (b)."   The government avers that it is the defendant's objection to this victim enhancement that most strikingly reflects the defendant's potential breach of his plea agreement – it reflects a complete disregard for and ignorance about the harm he inflicted on dozens of check cashing businesses, many of which are small sole-proprietorships.

In United States v. Kennedy, 554 F.3d 415, 419 (3d Cir. 2009), the Third Circuit held that account holders who were reimbursed for their losses do not qualify as "victims" under

Section 2B1.1(b)(2)(B).   The Court noted that its interpretation of the term victim for purposes of the loss guideline was consistent with that of the Fifth, Sixth, and Eighth Circuits (United States v. Yagar, 404 F.3d 967, 971 (6th Cir. 2005); United States v. Icaza, 492 F.3d 967, 970 (8th Cir. 2007); United States v. Conner, 537 F.3d 480, 489 (5th Cir. 2008)), and further observed that two of these courts had stated in dicta that an individual who was fully reimbursed might nonetheless qualify as a "victim" under certain circumstances.   The Third Circuit in Kennedy signaled its agreement with this reasoning, noting that had the government shown that the defrauded account holders "spent time or money seeking reimbursement, this would be a closer case."   Id. at 422. In examining the evidence in Icaza, the Eighth Circuit found that the enhancement could not be applied because "only the Walgreens corporation sustained an actual loss" and no individual Walgreens store "ultimately bore the pecuniary harm."   492 F.3d at 968-69.   The Eighth Circuit found its conclusion to be supported by the fact that the restitution order required payments to be made to the Walgreens corporation, not to individual stores. Id.

Here, the government will introduce evidence at sentencing both that 50 of the defendant's victims actually suffered pecuniary harm, and that those victims were not, as the defendant claims, reimbursed by their insurance companies or some other backer and/or if any did receive a reimbursement, they spent time and money seeking reimbursement.   In fact, contrary to the evidence in Icaza, the evidence here will demonstrate that the restitution order sought by the government will require payments to be made to each victim separately, and not to an insurance company or a master corporation.   At the sentencing hearing, Agent Kuechler will testify that the defrauded check cashers spent time filing police reports, dealing with the banks, and working with Agent Kuechler to try to gain reimbursement from the defendant, not, as the defendant so casually asserts, from their insurance companies or some other organization.   As one check casher

explained to Agent Kuechler, she made calls to attempt to verify the multiple checks cashed by the

defendant and his co-conspirators, and explained that her insurance deductible is too high to make

it financially feasible for her to seek reimbursement.   She further explained that it is not profitable

to file insurance loss claims when defrauded by schemes such as that of the defendant because it

will ultimately result in higher insurance premiums.   Accordingly, the government avers that the

evidence that will be introduced here supports the application of the enhancement under <u>Kennedy</u>.

Moreover, it is reprehensible that the defendant would try to escape the consequences of his

criminal conduct by arguing that he has fewer victims because insurance companies foot the bill of

the losses he caused, and the government respectfully requests that the Court consider whether this

position is in breach of the defendant's plea agreement.

> **3.      The Two-Level Upward Adjustment to the Defendant's Base
> Offense Level for the Possession of Device-Making Equipment Should
> Not Be Applied.**

Under U.S.S.G. § 2B1.1(b)(11)(A), the base offense level is increased by a

two-level upward adjustment when the offense involved the possession or use of device-making

equipment.   The defendant, <u>pro se</u>, objects to this enhancement on the grounds that the equipment

used to create checks in this case does not qualify under Title 18, United States Code, Section

1029(a)(9).   Application Note 10 to this section provides in relevant part that "'Device-making

equipment' has the meaning given that term in 18 U.S.C. 1029(e)(6); and . . . includes . . . any

hardware or software that has been configured as described in 18 U.S.C. 1029(a)(9)."

Government counsel has not identified a case in the Third Circuit addressing this

issue.   However, two other Circuits, the Fifth and the Tenth have rejected its application in cases

solely involving the passing of bad checks.   In <u>United States v. Hughey</u>, 147 F.3d 423 (5th

Cir.1998), the Fifth Circuit reversed the conviction of a defendant charged under 18 U.S.C. § 1029

with "trafficking or using one or more unauthorized access devices" because the defendant's conduct involved only "the creation and presentation of bad checks."   The court noted that the plain text of 18 U.S.C. § 1029(e)(1) specifically excludes conduct involving "transfer[s] originated solely by paper instrument," and found that the "parenthetical exclusion [contained in the provision] unambiguously places the passing of bad checks and similar conduct outside the scope of the federal statute."   Hughey, 147 F.3d at 434.

Similarly in United States v. Tatum, 518 F.3d 769 (10th Cir.2008), the Tenth Circuit stated "[n]either the counterfeit checks themselves, nor the account numbers printed on the counterfeit checks were access devices for purposes of subsections A and B of Section 2 B1.1(b)(10)."   Tatum, 518 F.3d at 771.   The court found that "[a]lthough the statute defining access devices is quite broad, it contains a key limitation.   An access device is defined as one of a number of means of account access that can be used 'to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).'"   Examining the legislative history of 18 U.S.C. § 1029, the Court wrote: "Indeed, the legislative history of § 1029 reveals that 'Congress was focused on the fraudulent use of [access] devices in connection with credit transactions,' United States v. McNutt, 908 F.2d 561, 563 (10th Cir.1990), and specifically intended to exclude conduct such as passing bad checks."   Tatum, 771; see S.Rep. No. 98–368, at 10 (1984); see also H.R.Rep. No. 98–894, at 19 (1984).

In light of these decisions and in the absence of a Third Circuit decision on point, the government agrees under the circumstances presented here that this two-level enhancement to the defendant's offense level should not be applied.

4.     **The Probation Office Properly Assessed an Additional Criminal History Point for the Defendant's Second Robbery Conviction.**

Section 4A1.1(e) provides: "Add 1 point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because such sentence was counted as a single sentence, up to a total of 3 points for this subsection." Applying the terms of this provision, the Probation Office applied an additional point to the defendant's criminal history for the defendant's second robbery conviction listed in paragraph 87 of the PSR.   That conviction and the other robbery conviction (listed in paragraph 84 of the PSR), which is docketed under a separate docket number from the first conviction and relates to the second victim, were counted as a single sentence under the guidelines because, although charged separately, they involved the same criminal conduct (the robbery of a husband and wife at gunpoint); the defendant also was sentenced for the two charges on the same day, and the sentences were ordered to run concurrently.   The application of the additional criminal history point has the effect of moving the defendant from Criminal History Category II to Category III, by raising the defendant's total criminal history points from three to four.

The assessment of the additional criminal history point is supported by the clear language of the Sentencing Guidelines.   The defendant's robbery convictions, where he pointed a gun at two people, clearly constitute crimes of violence.   The defendant did not receive any points under (a), (b), or (c) of § 4A1.1 because the sentence for that second conviction was counted as a single sentence with the other robbery conviction.   And the Probation Office did not assess more than a total of 3 points under 4A1.1(e).   Nothing more need be considered.   Clearly the Sentencing Commission could have carved out an exception for the circumstances of this case – where the second conviction arose out of the same criminal event as the first – but did not.   Nor

can the government identify any case law supporting the defendant's argument.   Accordingly, the additional single criminal history point was properly assessed, and the Probation Office correctly placed the defendant in Criminal History Category III.

### *Summary of Effect of Objections on Sentencing Guideline Calculation*

As above, the government respectfully argues that although the two-level upward enhancement for possession or use of device-making equipment should not be applied under the facts of this case, the two-level upward enhancement for "sophisticated means" is appropriate. Accordingly, the government respectfully requests that the Court adopt, with the appropriate modifications, the final sentencing guideline range calculated by the Probation Office, that is, for an offense level of 30 and a criminal history level IV, the defendant's final advisory sentencing guideline range is 121-151 months imprisonment.   As per the addendum to the parties' plea agreement, whatever the final calculation of the Court, the government recommends that the defendant be sentenced to the bottom of the sentencing guideline range determined by the Court.

## IV.   REQUEST FOR SPECIFIC PERFORMANCE

As above and as noted by the Probation Office, the defendant's pro se objections to the PSR are in breach of his plea agreement.   In United States v. Williams, 510 F.3d 416 (3d Cir. 2007), the Third Circuit addressed for the first time the appropriate remedy when a defendant breaches a plea agreement.   Although the procedural stature of Williams's differs from that herein in that in Williams, the government proceeded to sentencing despite the breach, the decision provides guidance for the circumstances presented herein.   First, the Third Circuit determined that the government must prove a breach by a preponderance of the evidence.   Williams, 510 at 424 (referencing United States v. Floyd, 428 F.3d 513, 516 (3d Cir. 2005) and United States v. Rivera, 357 F.3d 290, 293-94 (3d Cir. 2004)).   The Court also determined that the question of whether a

defendant has breached a plea agreement should be decided according to the same contract

principles that would be applied in analyzing a government breach, including the principle that the

Court will construe ambiguities in the agreement against the government.   Id. (citing Rivera, 357

F.3d at 294-95).   "The essential question is whether the alleged breaching party's "conduct is

consistent with the parties' reasonable understanding of the agreement." Id. (citing United States

v. Hodge, 412 F.3d 479, 485 (3d Cir. 2005)).

      Here, it is difficult to find any ambiguity in the defendant's breach: he stipulated to

the amount of foreseeable loss and to the number of victims.   Paragraph 6(a) and (b) of the plea

agreement provide:

> a.    The parties agree and stipulate that for the offenses of conviction charged in Counts One through Three of the information, the fraud loss caused or attempted to be caused by the defendant in furtherance of the criminal activity jointly undertaken by the defendant and co conspirators was more than $1,000,000 but less than $2,500,000; this amount was reasonably foreseeable to the defendant in connection with the conspiracy; and the defendant's Guideline range should be calculated based on this amount pursuant to U.S.S.G. § 2B1.1.

> b.    The parties agree and stipulate that, under § 2B1.1(b)(2)(B), the base offense level is increased by a four-level upward adjustment because the offense involved 50 or more victims.

Any assertion to the contrary at the sentencing hearing will put the defendant in plain violation of

these stipulations.

      Under Williams, there are two possible remedies for a breach of a plea agreement:

"specific performance or to allow withdrawal of the plea.'"   Id. at 427 (citing Rivera, 357 F.3d at

297); see also, generally, 5 Wayne R. LaFave et al., Criminal Procedure § 21.2(e), at 60 (2d ed.

Supp. 2007) ("[I]t is generally accepted that 'when a defendant breaches his plea agreement, the

[g]overnment has the option to either seek specific performance of the agreement or treat it as

unenforceable' (at least absent language in the plea agreement specifying fewer or other

remedies).") (citation omitted).

The defendant reaped many benefits of his plea agreement with the government. For example, he was charged with uttering false and counterfeit checks under Title 18, United States Code, Section 513, when he could have been charged with mail, wire and bank fraud, or conspiracy to commit those offenses, in violation of Title 18, United States Code, Sections 1341 (mail), 1343 (wire), 1344 (bank), and 1349 (conspiracy).   Any of those latter charges carry a longer statutory maximum sentence and a higher base offense level than the Section 513 charge. He also obtained a favorable stipulation from the government, contained in the amendment to the plea agreement, regarding the government's sentencing recommendation:   "The parties agree and stipulate that at the time of sentencing, the government will recommend a sentence of imprisonment at the bottom of the final Sentencing Guideline range determined by the Court."

As the Third Circuit has observed, "a defendant should not be permitted 'to get the benefits of [his] plea bargain, while evading the costs ... and contract law would not support such a result.'" <u>Williams</u>, 510 F.3d 422 (citation omitted).   Here, at this juncture when the defendant's potential breach can be remedied by an order for specific performance, the government respectfully requests that the Court order the defendant to specifically perform the terms of his agreement.   <u>See, e.g.</u>, <u>Williams</u>, 510 F.3d 427-428 ("when the government requests specific performance at the hands of a defendant's breach, we recognize that resentencing under the terms of the executed plea agreement might be the only appropriate remedy").

## V.   <u>ANALYSIS</u>.

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) indicates that the most appropriate sentence is a sentence at the bottom of the sentencing guideline range determined by the Court.

The Supreme Court has declared:   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 2007 WL 4292116 (U.S. Dec. 10, 2007).   Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).   Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).[1]

---

1 Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"   United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

Consideration of the 3553(a) Factors

Restitution in the amount of $183,615.95 should be ordered.   A review of the remaining 3553(a) factors illustrates the propriety of a sentence at the bottom of the sentencing guideline range determined by the Court.

      **1.**        **The nature and circumstances of the offense and the history and characteristics of the defendant.**

The defendant's fraud and straw purchasing violations are extremely serious.   As to the former, if he had been successful, he would have defrauded 50 businesses, banks and individuals of a total of well over $1,000,000.   The latter involved obtaining three firearms that he was specifically prohibited from possessing because of his prior convictions for gunpoint robbery. As this Court is well aware, Philadelphia is awash in guns and gun related crime and violence.[2] From 2002 to 2009, there were 13,502 individuals shot in Philadelphia.   Thus, on average, more than 1,600 persons are shot every year in the city, 32 per week, five per day.   Indeed, during the week of July 12, 2010, there were 54 shootings and five homicides in Philadelphia; in one of the shootings, the victims were just 12 and 14 years old.[3]

Between 2002 and 2009, half of all shooting victims were between the ages of 14 and 24.[4]   Of the ten largest cities in the United States, residents of Philadelphia are the most likely

---

[2] Philadelphia Adult Probation and Parole Department, Weapons Related Injury Surveillance System (WRISS) Report 2002 2009: An Analysis of Shooting Incidents, fig.1.1 (2010), available at http://www.courts.phila.gov/pdf/criminal reports/WRISS REPORT 2002 2009.pdf.

[3] Appendix A, Philadelphia Police Statistics for week of July 12, 2010 to July 18, 2010.   WRISS Report, supra, figure 2.2.

[4] John Sullivan, et al., Gun Arrests Galore, No Convictions At All, Phila. Inquirer, Dec. 16, 2009, at A1, available at http://www.philly.com/inquirer/special/79386622.html.

to be robbed at gunpoint,[5] with about 4,500 gun point robberies reported every year.   On some

city blocks in Philadelphia, the chance of getting shot is 1 in 50.[6]   A large number of these

shootings are fatal; between 2003 and 2009 there were 2,009 homicides caused by gunfire.[7]

   The Pennsylvania Commission to Address Gun Violence noted in 2005 that the

impact of guns and gun related violence on the public is enormous: "Pennsylvania loses more than

one person per day to gun violence, and three more people are injured every day by firearms.   Not

only does gun violence take a devastating toll on those who have been shot, but also on their

families, friends and neighborhoods . . . gun violence is a public health problem that impacts on

our health delivery system."[8]

   In the midst of a nation-wide rise in violent crime,[9] the first half of 2013 in

Philadelphia saw 38 percent fewer homicides and 18 percent fewer shootings than the first half of

the previous year.[10]   This decline has been attributed to everything from smarter policing[11] to

---

5 Craig R. McCoy, et al., Justice: Delayed, Dismissed, Denied, Phila. Inquirer, Dec. 13, 2000, at A1, available at http://www.philly.com/inquirer/special/79150347.html.

6 Emma Schwartz, Controlling Guns in Philadelphia, U.S. News & World Report, March 6, 2008, available at http://www.usnews.com/articles/news/politics/2008/03/06/controlling guns in philadelphia.html.

7 WRISS Report, supra, figure 1.4.

8 Commission to Address Gun Violence, Final Report and Recommendations, April 22, 2005, at 7, available at http://media.philly.com/documents/gun18.pdf.

9 Emily Babay, FBI: Violent crime down in Philly, up nationwide, Philly.com, June 3, 2013, available at http://www.philly.com/philly/news/FBI_Violent_crime_down_in_Philly_up_nationwide.html.

10 Inquirer Editorial: Lower murder rate didn't just happen, Philly.com, July 6, 2013, available at http://articles.philly.com/2013-07-06/news/40393822_1_violent-crime-crime-statistics-north-philadelphia.

11 Id.

weather patterns,[12] however, and it is by no means clear that the trend will continue.   Rates of gun

violence in Philadelphia remain unacceptably high,[13] and Philadelphia remains the leader in

violent crime, murder, and robbery rates among the ten largest cities in the U.S.[14]

                Here, we have a defendant whose criminal history reflects a high propensity for

violence – convictions for hitting a mother and child followed by convictions for robbery at

gunpoint.   Perhaps the defendant's How-To manual provides the explanation for the defendant's

criminal conduct in this case: "White-Collar Crime is one of the most sophisticated rackets of

illegal activity today.   Unlimited amounts of money can be made virtually overnight and the

parties involved usually face minimal and/or NO CONSEQUENCES at al."   Clearly the crimes

committed by the defendant warrant a significant sentence, and so the government recommends a

sentence of at the bottom of the sentencing guideline range determined by the Court, which if the

Court agrees with the government's arguments, would result in a sentence of imprisonment of 121

months.

---

12 Homicides drop sharply in Philadelphia and New York, but unequal rates persist, supra.

13 Jim Macmillan, Homicides drop sharply in Philadelphia and New York, but unequal rates
persist, #GunCrisis: Philadelphia, July 1, 2013, available at
http://guncrisis.org/2013/07/01/homicides-drop-sharply-in-philadelphia-and-new-york-but-unequ
al-rates-persist/.

14 See Uniform Crime Reports, Crime in the United States 2012, Federal Bureau of Investigation,
Table 4, available at
http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/preliminary-annual-uniform-crime-re
port-january-december-2012/tables/table-4/view.

**2.      The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, reflect the seriousness of the offense, and promote respect for the law.   In this case the defendant defrauded a total of 50 banks, individuals and check cashing companies, and attempted to defraud numerous others.   He recruited more than 70 people to assist him in his criminal activity, some of whom had no prior criminal history and were in their early twenties.   He also straw purchased three firearms.   Simply put, the defendant's offenses had an adverse effect on numerous people and businesses, and gave him access to firearms that because of his violent criminal history, he was prohibited from possessing.   Further, the defendant committed these crimes within a year of having been released from a long period of incarceration for two of those violent crimes.   Under these circumstances, the government respectfully submits that the defendant's criminal activity was extremely serious and that the defendant has not previously demonstrated any respect for the law or for his fellow citizens.   It is important for the Court to impose a sentence that promotes respect for the law from both the defendant as well as the community.

**3.      The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

For the reasons stated above, the recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense, and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated.   In this case, there is ample evidence that the defendant needs specific deterrence: he is a recidivist who penned at least one "How-To" commit a crime manuscript during his last prison sentence, and as noted

above, lied to the Probation Office about having no income and potentially about owning no other

significant assets.

     **4.**     **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

     There is no need in this case to adjust the sentence in order "to provide the

defendant with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner . . . ."  § 3553(a)(2)(D).   The defendant spent his previous

time in prison studying and writing books on how to commit white-collar crime.

     **5.**     **The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

     While the sentencing guidelines are advisory, they remain the sole means available

for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in

adopting the Sentencing Reform Act of 1984.   Reference to the guidelines, while carefully

considering the 3553(a) factors particularly relevant to an individual defendant, is the only

available means of preventing the disfavored result of basing sentences on the luck of the draw in

judicial assignments.   The Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully
> consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in
> the guidelines."   The section of *Booker* that makes the Guidelines advisory
> explains that "the remaining system, while not the system Congress enacted,
> nonetheless continue[s] to move sentencing in Congress' preferred direction,
> *helping to avoid excessive sentencing disparities while maintaining flexibility*
> *sufficient to individualize sentences where necessary."*   Booker, 543 U.S. at
> 264-65 (emphasis added).   The Guidelines remain at the center of this effort to
> "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the
> Sentencing Commission will continue "to promote uniformity in the sentencing
> process" through the Guidelines.   Id. at 263.   We have likewise observed that the
> "'Guidelines remain an essential tool in creating a fair and uniform sentencing

regime across the country.'"   *Cooper*, 437 F.3d at 331 (quoting *United States v.*
*Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

<u>United States v. Ricks</u>, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).   Therefore, the

Supreme Court has held that "district courts must begin their analysis with the Guidelines and

remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate,

and uniform sentencing of criminal offenders.   <u>Gall</u>, 2007 WL 4292116, at *7 n.6.

## VI.   <u>CONCLUSION</u>

As explained in detail *infra*, the 3553(a) factors support the imposition of a

sentence at the bottom of the sentencing guideline range determined by the Court.   The

government respectfully requests that such a sentence be imposed.


Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


_____/s/_____
Ashley K. Lunkenheimer
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this date I caused a true and correct copy of the foregoing to

be served by electronic filing upon the following:

Edward Meehan, Esquire

                    _____/s/_____
                    Ashley K. Lunkenheimer
                    Assistant United States Attorney

Date:  January 27, 2014